## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
BENJAMIN WITTES,                       )     Civil Action No. 1:17-cv-01627-RC
                                                    )
            Plaintiff,                             )
                                                    )
      v.                                            )
                                                    )
U.S. DEPARTMENT OF JUSTICE and )
OFFICE OF MANAGEMENT AND      )
BUDGET                                          )
                                                    )
            Defendants.                          )
_____ )

## JOINT STATUS REPORT

The United States Department of Justice ("DOJ") and the Office of Management and

Budget ("OMB") (collectively, "Defendants"), and Plaintiff Benjamin Wittes respectfully submit

this Joint Status Report pursuant to the Court's Order of December 13, 2017.  The parties

incorporate by reference their Joint Status Reports of October 12, 2017, November 13, 2017, and

December 12, 2017 (ECF Nos. 8, 10, 11).  The parties report as follows:

1.        On August 11, 2017, Plaintiff initiated this action under the Freedom of

Information Act ("FOIA") against OMB and DOJ.  The Complaint alleges that this action

involves FOIA requests dated April 14, 2017, and submitted to, in relevant part, DOJ's Office of

Information Policy ("OIP"), DOJ's National Security Division ("NSD"), and OMB.   The FOIA

requests centered on President Donald J. Trump's assertion, in his February 28, 2017 speech to a

joint session of Congress, that "[a]ccording to data provided by the Department of Justice, the

vast majority of individuals convicted of terrorism and terrorism-related offenses since 9/11

came here from outside of our country." Plaintiff's requests sought records relating to several categories of information, including, generally speaking:

      a.      All records reflecting any data or information relating to the nationality or country of origin of individuals convicted of domestic or international terrorism-related offenses from 2001 onward;

      b.      All records reflecting communications between DOJ and the Executive Office of the President relating to data concerning the nationality or country of origin of individuals convicted of domestic or international terrorism-related offenses;

      c.      All records in preparation for or in reaction to the President's February 28, 2017 address to the Joint Session of Congress, specifically those referring to the President's characterization of data provided by DOJ;

      d.      All records reflecting communications between DOJ and the Executive Office of the President in preparation for the address to the Joint Session of Congress on February 28, 2017;

      e.      Records describing the processing of Plaintiff's FOIA requests;

      f.      All records validating or verifying the President's statement at the address to the Joint Session of Congress on February 28, 2017 regarding the nationality or country of origin of individuals convicted of terrorism and terrorism-related offenses since September 11, 2001.

2.      Defendants filed their Answer on September 27, 2017 (ECF No. 7).

3.      OIP, NSD, and OMB have initiated searches for records responsive to Plaintiff's FOIA requests.

4.      OIP conducted a keyword-based search for records, which resulted in excess of 75,000 hits (constituting approximately 242,000 items when counting attachments).  The parties previously agreed that OIP will prioritize its review of records potentially responsive to parts 3 and 4 of the "first April 14" FOIA request to DOJ.  To that end, OIP has located approximately 2,200 records potentially responsive to those parts of Plaintiff's FOIA request.  OIP anticipates making a final release of non-exempt records responsive to parts 3 and 4 of Plaintiff's "first April 14" request no later than February 28, 2018.  Because the parties have conferred and will continue to confer regarding the scope of the other parts of Plaintiff's FOIA requests, OIP believes it is premature to set a schedule for any potential release of non-exempt records responsive to those parts of Plaintiff's FOIA requests, as discussed *infra*.

5.      NSD has conducted a search for records.  To date, they have located approximately 60 responsive records.  NSD anticipates making a final release of these records no later than February 7, 2018.

6.      OMB has completed its search for records responsive to Plaintiff's request.  OMB has located approximately 500 potentially responsive records.  OMB anticipates making a release of records on or before January 31, 2018 with potentially one additional release in February 2018.

7.      At this time, the parties agree that it is too early to determine whether they anticipate summary judgment briefing.

8.      The parties disagree as to a proposed schedule going forward.  They offer the following positions and proposals:

**Plaintiff's Proposal**:

Consistent with the parties' prior agreement, OMB will make an interim response on or before January 31, 2018 and a potential final response on or before February 28, 2018; NSD will make a final release of records no later than February 7, 2018; and OIP will make a final response to the prioritized parts 3 and 4 of Plaintiff's "first April 14" request no later than February 28, 2018.  Plaintiff does not seek to change or disrupt that agreement.

Plaintiff has, however, asked OIP to prioritize and accelerate production of certain additional responsive documents used by DOJ and others within the Executive Branch to shape the public's understanding of matters at the center of this FOIA lawsuit.  Specifically, on January 16, 2018, the Department published "Executive Order 13780: Protecting the Nation From Foreign Terrorist Entry Into the United States,"[1] ("DOJ Report").  Because the substance of the report is tightly connected to the gravamen of this FOIA lawsuit, Plaintiff has asked OIP to produce by February 7, 2018 any responsive documents that were relied upon in preparing the report.  OIP has stated it will not agree to that proposal.

The report purported to analyze the national origin of individuals "convicted of international terrorism-related charged in U.S. federal courts between September 11, 2001, and December 31, 2016," and based on that analysis it stated that 73 percent of those individuals were "foreign-born."  DOJ Report at 2.  The report stated that its conclusion "reflects defendants convicted in cases involving charged violations of federal statutes that are directly related to international terrorism, as well as defendants convicted in cases involving charged violations of a variety of other statutes where the investigation involved an identified link to international terrorism," including "individuals who committed offenses while located abroad . . . who were

---

[1] The report is attached hereto as Exhibit A.

transported to the United States for prosecution," but its calculation excluded "individuals convicted of offenses relating to domestic terrorism" and "terrorism-related convictions in state court." *Id.* (internal footnotes omitted).

The Executive Branch, including DOJ and the President, have amplified the report's conclusions and cited them as a justification for more restrictive immigration policies.  In DOJ's press release accompanying the report, the Attorney General is quoted stating that the report "reveals an indisputable sobering reality – our immigration system has undermined our national security and public safety."[2]  The press release – which appears under the headline, "DOJ,DHS Report:  Three Out of Four Individuals Convicted of International Terrorism and Terrorism-Related Offenses were Foreign Born" – also explicitly links the report's findings to a "list of legislative priorities" sent by the Trump Administration to Congress.  On Twitter, the President characterized the report's findings as showing that "nearly 3 in 4 individuals convicted of terrorism-related charges are foreign born" – eliding the report's distinction between international and domestic terrorism – and invoked it as support for restrictive immigration policies.[3]  The DOJ deployed a senior official to participate in a White House press briefing trumpeting the report's findings.[4]

Mr. Wittes' initial request was prompted by the President's dual assertions, in his February 2017 speech to Congress, that (1) the "vast majority of individuals convicted of terrorism and terrorism-related offenses since 9/11 came here from outside of our country," and (2) his attribution of that proposition to DOJ.  The DOJ Report enabled the President to reiterate

---

[2] The press release is available at https://www.justice.gov/opa/pr/doj-dhs-report-three-out-four-individuals-convicted-international-terrorism-and-terrorism.
[3] https://twitter.com/realDonaldTrump/status/953406423177859073.
[4] *See, e.g.*, Sam Thielman, *At Briefing, Press Blasts 'Misleading' Trump Admin Terrorism Stats.*, TMP (Jan. 17, 2018), https://talkingpointsmemo.com/muckraker/at-briefing-press-blasts-misleading-trump-admin-terrorism-stats.

both assertions – this time in a tweet rather than an address to Congress.  Given the close

connection between the subject matter of the report and Mr. Wittes' FOIA request, there is little

doubt that at least some of the materials used to prepare the report fall within the scope of the

request.  As a matter of common sense and efficiency, it makes sense for OIP to prioritize the

production of responsive documents used in the creation of the DOJ report.  To be clear, Plaintiff

is only seeking documents related to the DOJ Report that he is already entitled to because they

are responsive to his request – he is not asking for the production of documents beyond the scope

of his request (including, for example, records that post-date the appropriate cut-off date for the

search for records).

As noted in Paragraph (4), *supra*, the parties have previously bifurcated the schedule for

OIP's search, sequencing documents related to the President's February 2017 speech ahead of

underlying documents relating to all terrorism convictions since 2001.  The publication of the

DOJ Report, however, reveals that a significant body of responsive documents were almost

certainly compiled by DOJ.  In preparing the report, DOJ created a structure to allow OIP to

much more efficiently review and produce much of that responsive material.  The imperative to

seize that efficiency, moreover, is heightened considerably by the context of the Report's

publication and its amplification by DOJ and other administration officials.  The release of the

report was accompanied by a concerted effort by DOJ, the President, and other elements of the

Executive Branch to characterize the relationship between national origin and terrorism for

purposes of shaping an urgent public debate on immigration policy.  The proposition that the

threat of terrorism is overwhelmingly linked to immigration status is dubious.  There is a weighty

interest in allowing the public to scrutinize the President's basis for advancing that proposition.

Providing responsive documents in an efficient and speedy manner to Mr. Wittes – a leading

national security commentator who has been an influential voice in questioning the soundness of the President's factual assertions in this area[5] – will serve that interest. *Cf. Protect Democracy Project, Inc. v. U.S. Dep't of Defense*, 263 F. Supp. 3d 293, 301 (granting preliminary injunction in FOIA case where "ongoing public and congressional debates about issues of vital national importance cannot be restarted or wound back") (quoting *Elec. Frontier Found. v. Office of Dir. Of Nat'l Intelligence*, No. 07-cv-5278, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007)).

**Defendants' Proposal**:

Defendants propose that (i) OMB make an interim response on or before January 31, 2018 and a potential final response on or before February 28, 2018; (ii) NSD make a final release of records no later than February 7, 2018; (iii) OIP make a final response to the prioritized parts 3 and 4 of Plaintiff's "first April 14" request no later than February 28, 2018; and (iv) the parties file a joint status report no later than March 30, 2018 on the progress of the parties' discussions regarding the scope of the requests and whether the parties anticipate summary judgment briefing.

Defendants' proposal is reasonable and consistent with the parties' prior agreements. Plaintiff has represented that it accepts the above proposed processing schedule with respect to OMB and NSD.  As represented in the parties' December 12, 2017 joint status report, the parties previously had also agreed that OIP would prioritize its processing of records potentially responsive to parts 3 and 4 of Plaintiff's "first April 14" request and make a final response to those parts of the request no later than February 28, 2018.  *See* Joint Status Report at 4, ECF No.

---

[5] *See, e.g.*, Lisa Daniels, Nora Ellingsen, Benjamin Wittes, *Trump Repeats His Lies About Terrorism, Immigration and Justice Department Data*, LAWFARE (Jan. 16, 2018), https://lawfareblog.com/trump-repeats-his-lies-about-terrorism-immigration-and-justice-department-data; Benjamin Wittes, *The Friendlist Lawsuit Ever Filed Against the Justice Department*, LAWFARE (Aug. 12, 2017), https://www.lawfareblog.com/friendliest-lawsuit-ever-filed-against-justice-department;  Benjamin Wittes, *Did the Justice Department Really Support the President's Misstatement to Congress?  Let's Find Out?*, LAWFARE (Apr. 17, 2017), https://www.lawfareblog.com/did-justice-department-really-support-presidents-misstatement-congress-lets-find-out;

11 (Dec. 12, 2017).  Despite that agreement, Plaintiff now demands that OIP instead—or additionally—prioritize a new subset of documents:  documents relating to a report on or around January 16, 2018 by the Department of Justice and U.S. Department of Homeland Security entitled "Executive Order 13780:  *Protecting the Nation From Foreign Terrorist Entry Into the United States* Initial Section 11 Report" (the "Report")—and to complete processing of these records by February 7, 2018.

As a threshold matter, Plaintiff's FOIA request nowhere discusses or mentions the Report, which of course post-dates Plaintiff's request.  OIP therefore has no obligation to search for or process records related to the Report.  *See, e.g.*, *Bartko v. DOJ*, 167 F. Supp. 3d 55, 65-66 (D.D.C. 2016) (agency not required to conduct search for records relating to subject matter unaddressed in FOIA request).  Nor does OIP have an obligation to process records that post-date any appropriate cut-off date for the agency's search.  *See, e.g.*, *Bonner v. DOS*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing."); *Defenders of Wildlife v. DOI*, 314 F. Supp.2d 1, 12 n.10 (D.D.C. 2004) (recognizing that records prepared after the cut-off date "are not covered by th[e] request").

To the extent that documents already collected by OIP in connection with Plaintiff's current request may relate to the Report, OIP is willing to confer with Plaintiff on an appropriate schedule for processing such records.  Out of the over 200,000 potentially responsive records that the parties had agreed OIP would deprioritize, OIP has identified approximately 2,000 records that are potentially responsive to Plaintiff's request and may also relate to the Report. However, Plaintiff's current proposal—that OIP complete processing of such records by February 7, 2018—is inconsistent with the parties' prior agreement and unreasonable in light of

the current circumstances.  Since the parties' agreement in December, OIP has expended

substantial time and efforts to process records potentially responsive to parts 3 and 4 of

Plaintiff's request—including completing its review of the approximately 2,200 potentially

responsive records and continuing to conduct the necessary inter- and intra-agency

consultations—in order to comply with the agreed-upon schedule.  Plaintiff's attempt to

unilaterally alter the parties' agreement well after the fact is improper.

What is more, Plaintiff seeks an unreasonably truncated timetable for processing.  In

practice, Plaintiff's proposal effectively asks OIP to stop its current processing efforts in their

tracks and re-prioritize those efforts, review approximately 2,000 potentially responsive records

for responsiveness and exemptions, and (if applicable) complete all inter- and intra-agency

consultations—and to do all of this within 9 days of the filing of this joint status report.

Accordingly, OIP opposes Plaintiff's proposed schedule to complete processing of

records related to the Report by February 7, 2018.  Instead, OIP proposes that, consistent with

the parties' agreement, it complete processing of the prioritized parts 3 and 4 of Plaintiff's

request no later than February 28, 2018.  Upon completion of the processing of those parts, OIP

will confer with Plaintiff on the scope of the other parts of Plaintiff's request and on an

appropriate timetable for the processing of records potentially responsive to such parts, including

such records that may also relate to the Report.

Dated:  January 29, 2018

/s/ Laurence Schwartztol
JUSTIN FLORENCE (DC Bar No. 988953)
LAURENCE SCHWARTZTOL
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave., NW #163
Washington, DC 20006
Telephone: (202) 599-0466
Fax: (929) 777-8428

*Attorneys for Plaintiff*

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

/s/ Chetan A. Patil
CHETAN A. PATIL
Trial Attorney (DC Bar No. 999948)
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone: (202) 305-4968
Fax: (202) 616-8470
chetan.patil@usdoj.gov

*Attorneys for Defendants*





# Executive Order 13780: *Protecting the Nation From Foreign Terrorist Entry Into the United States* Initial Section 11 Report

January 2018

## I.    Introduction

On March 6, 2017, President Donald J. Trump issued Executive Order 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States*, which declared that "it is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals," and directed a series of actions to enhance the security of the American people. The actions directed by Executive Order 13780 have—among other things—raised the baseline for the vetting and screening of foreign nationals, improved our ability to prevent the entry of malicious actors, and enhanced the security of the American people.

Most of the critical national security enhancements implemented and effectuated as a result of Executive Order 13780 are classified in nature, and will remain so to prevent malicious actors from exploiting our immigration system.  However, to "be more transparent with the American people and to implement more effectively policies and practices that serve the national interest," Section 11 of Executive Order 13780 requires the Secretary of Homeland Security, in consultation with the Attorney General, to collect and make publicly available the following information:

(i) Information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;

(ii) Information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;

(iii) Information regarding the number and types of acts of gender-based violence against women, including so-called "honor killings," in the United States by foreign nationals; and,

(iv) Any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

Accordingly, subsequent to the issuance of Executive Order 13780, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) worked collaboratively to provide information responsive to the requirements of Section 11.  Unless specified otherwise, this initial report includes information for the period from September 11, 2001 until the date of issuance. Notably, however, because of previous information collection and reporting practices of DHS and DOJ, some of the information provided in this initial report does not capture the full spectrum of statistics envisioned by Executive Order 13780.  DHS and DOJ will endeavor to provide additional information in future reports issued pursuant to the requirements of Executive Order 13780.

## II.      Information Responsive to Section 11

   a.   Information Regarding the Number of Foreign Nationals Charged with or
        Convicted of Terrorism-Related Offenses, or Removed from the United States
        Based on Terrorism-Related or Other National Security Reasons.

According to a list maintained by DOJ's National Security Division, at least 549
individuals were convicted of international terrorism-related charges in U.S. federal courts
between September 11, 2001, and December 31, 2016.  An analysis conducted by DHS determined
that approximately 73 percent (402 of these 549 individuals) were foreign-born.  Breaking down
the 549 individuals by citizenship status at the time of their respective convictions reveals that:

   • 254 were not U.S. citizens;
   • 148 were foreign-born, naturalized and received U.S. citizenship; and,
   • 147 were U.S. citizens by birth.[1]

Information pertaining to individuals convicted of international terrorism-related offenses
after December 31, 2016, as well as information pertaining to individuals not yet convicted but
facing charges for international terrorism-related offenses will be provided in future reports
required by Section 11.

The conviction information outlined above is based on public convictions in federal courts
between September 11, 2001, and December 31, 2016 resulting from international terrorism
investigations, including investigations of terrorist acts planned or committed outside the territorial
jurisdiction of the United States over which Federal criminal jurisdiction exists and those within
the United States involving international terrorists and terrorist groups.  This information reflects
defendants convicted in cases involving charged violations of federal statutes that are directly
related to international terrorism,[2] as well as defendants convicted in cases involving charged
violations of a variety of other statutes where the investigation involved an identified link to
international terrorism.[3]  This information includes both individuals who committed offenses while
located in the United States and those who committed offenses while located abroad, including
defendants who were transported to the United States for prosecution. It does not include
individuals convicted of offenses relating to domestic terrorism, nor does it include information
related to terrorism-related convictions in state courts.

In future reports, DHS and DOJ will endeavor to provide additional details pertaining to
foreign nationals or naturalized U.S. citizens convicted of international terrorism-related offenses,
such as their manner of entry into the United States, countries of origin, general immigration
histories, and other related information.  While DHS and DOJ do not yet have complete, final

---

[1] Information pertaining to the citizenship status of the parents of these 147 individuals was not available at the time
of this report's issuance.
[2] These statutes prohibit, for example, terrorist acts abroad against United States nationals, the use of weapons of
mass destruction, conspiracy to murder persons overseas, providing material support to terrorists or foreign terrorist
organizations, receiving military style training from foreign terrorist organizations, and bombings of public places or
government facilities.
[3] For example, these cases could include offenses such as those involving fraud, immigration, firearms, drugs, false
statements, perjury, and obstruction of justice, as well as general conspiracy charges.

information about these individuals available at the time of this report's publication, the following are illustrative examples among the 402 convictions of foreign nationals or naturalized U.S. citizens:

- **Mahmoud Amin Mohamed Elhassan**, a national of Sudan, was admitted to the United States in 2012 as a family member of a lawful permanent resident from Sudan. In 2016, he pleaded guilty to attempting to provide material support to ISIS, and in 2017 was subsequently sentenced to 11 years in prison.[4]

  According to court documents, Elhassan aided and abetted the attempt of Joseph Hassan Farrokh, 29, to travel from the United States to Syria in order to fight on behalf of ISIS. As part of their plan, Farrokh would travel first, followed by Elhassan at a later date. Farrokh and Elhassan spoke in detail about their potential travel. Both men spoke openly with each other about supporting ISIS and violent jihad, with Farrokh saying on October 2, 2015, that he had no patience and wanted to go right away and "chop their heads."

  According to the statement of facts, in an effort to conceal their plans to support ISIS, Farrokh and Elhassan communicated using apps they believed were safe from law enforcement detection. In the summer of 2015, Farrokh and Elhassan talked more seriously about going to join ISIS and concluded that they needed someone to help them do so. Elhassan contacted like-minded people all over the world and the men pursued two separate plans to travel to Syria to join ISIS.

  According to the statement of facts, Farrokh and Elhassan conspired with other persons they believed would help facilitate their travel to Syria. Over the course of many meetings, the men discussed in detail their travel plans and efforts to avoid law enforcement detection, including Farrokh shaving his beard and flying out of Richmond International Airport, where they believed there would be less security. Farrokh and Elhassan agreed that Farrokh should tell his family that he intended to travel to Saudi Arabia to study.

- **Abdurasaul Hasanovich Juraboev**, a national of Uzbekistan, was admitted to the United States as a diversity visa lottery recipient in 2011. In 2015, he pleaded guilty to conspiring to support ISIS, and in 2017 was subsequently sentenced to 15 years in prison.[5]

  According to court documents, Juraboev posted a threat on an Uzbek-language website to kill President Obama in an act of martyrdom on behalf of ISIS. In subsequent interviews by federal agents, Juraboev stated his belief in ISIS's terrorist agenda, including the establishment by force of an Islamic caliphate in Iraq and Syria. Juraboev stated that he wanted to travel to Syria to fight on behalf of

---

[4] *Virginia Man Sentenced to 11 Years in Prison for Attempting to Provide Material Support to ISIL*, THE UNITED STATES DEPARTMENT OF JUSTICE (2017), https://www.justice.gov/opa/pr/virginia-man-sentenced-11-years-prison-attempting-provide-material-support-isil.

[5] *Brooklyn Man Sentenced to 15 Years in Prison for Conspiring to Provide Material Support to Terrorists*, THE UNITED STATES DEPARTMENT OF JUSTICE (2016), https://www.justice.gov/usao-edny/pr/brooklyn-man-sentenced-15-years-prison-conspiring-provide-material-support-terrorists.

ISIS but lacked the means to travel. He added that, if he were unable to travel, he would engage in an act of martyrdom on U.S. soil if ordered to do so by ISIS, such as killing the President or planting a bomb on Coney Island. During the next several months, Juraboev and a co-conspirator discussed plans to travel to Syria to fight on behalf of ISIS, culminating in Juraboev's purchase on December 27, 2014, of a ticket to travel from John F. Kennedy International Airport in Queens, New York, to Istanbul, Turkey, departing on March 29, 2015.

- **Abdinassir Mohamud Ibrahim**, a national of Somalia, was admitted to the United States as a refugee in 2007. In 2015, he was sentenced to 15 years in prison for conspiring to provide material support to Al-Shabaab, a designated foreign terrorist organization, and for making a false statement in an immigration matter.[6]

  Ibrahim admitted that from about May 18, 2010, to about January 31, 2014, he knowingly conspired to provide material support and resources, specifically sending emails enlisting support for al-Shabaab and making a cash payment to a known member of al-Shabaab for the benefit of the organization. Ibrahim knew at the time that al-Shabaab was designated by the United States as a foreign terrorist organization. Ibrahim also pleaded guilty to making a false statement in an immigration matter.

  According to court documents, Ibrahim lied in his application for naturalization as he had previously lied on his request for refugee status, falsely claiming that he was of a member of a minority group in Somalia and suffered persecution as a result thereof. Ibrahim also admitted he had lied on his naturalization application by having previously lied on his refugee application by falsely claiming that he had not provided material support to a terrorist group, when he had in fact provided monetary support to a member of a terrorist organization.

- **Mohamad Saeed Kodaimati**, a national of Syria, was admitted to the United States in 2001 as a family member of a lawful permanent resident from Syria, and subsequently obtained United States citizenship through naturalization. Kodaimati entered the United States with the family member. That family member was previously admitted as the unmarried son or daughter of a lawful permanent resident, who earlier received status as the parent of a United States citizen. In 2016, Kodaimati was sentenced to 96 months in prison for making false statements in a terrorism investigation.[7]

  As part of his guilty plea, Kodaimati acknowledged that he lied in March 2015 when he stated that he did not know any members of Islamic State in Iraq, a designated foreign terrorist organization known as ISIS; that he falsely claimed that while in Syria he was never involved with Al Nusrah, also a foreign terrorist

---

[6] Somali Citizen Sentenced to 15 Years in Federal Prison for Conspiring to Provide Material Support to Al-Shabaab, THE UNITED STATES DEPARTMENT OF JUSTICE (2015), https://www.justice.gov/usao-wdtx/pr/somali-citizen-sentenced-15-years-federal-prison-conspiring-provide-material-support-al.

[7] San Diego Man Sentenced to 96 months in Prison for Making False Statements in an International Terrorism Investigation, THE UNITED STATES DEPARTMENT OF JUSTICE (2016), https://www.justice.gov/usao-sdca/pr/san-diego-man-sentenced-96-months-prison-making-false-statements-international.

organization; and that he again lied when he said that while in Syria he had never engaged in combat or fired a weapon at anyone.

In his plea agreement, Kodaimati admitted that he knew a member of ISIS and that while in Syria he participated in a battle against the Syrian regime, including shooting at others, in coordination with Al Nusrah fighters.

- **Ali Shukri Amin**, a national of Sudan, was admitted to the United States in 1999 as the child of a diversity visa lottery recipient, and subsequently obtained United States citizenship through naturalization. In 2015, he was sentenced to more than 11 years in prison for conspiring to provide material support and resources to ISIS.[8]

  According to court documents, Amin admitted to using Twitter to provide advice and encouragement to ISIS and its supporters. Amin provided instruction on how to use Bitcoin, a virtual currency, to mask the provision of funds to ISIS, as well as facilitating ISIS supporters seeking to travel to Syria to fight with ISIS. Additionally, Amin admitted that he assisted an 18-year-old male resident of Virginia, Reza Niknejad, to travel to Syria to join ISIS in January 2015. Niknejad was subsequently charged with conspiring to provide material support to terrorists, conspiring to provide material support to ISIS, and conspiring to kill and injure persons abroad.

- **Khaleel Ahmed,** a national of India, was admitted to the United States in 1998 as a family member of a naturalized United States citizen from India. Ahmed subsequently became a United States citizen through naturalization. In 2010, he was sentenced to more than eight years in prison for conspiring to provide material support to terrorists.[9]

  According to court documents, the criminal conspiracy involving Khaleel Ahmed and his cousin, Zubair, began no later than April 1, 2004, and continued until their arrests on February 21, 2007. As part of the conspiracy, the defendants made preparations to travel overseas in order to engage in acts that would result in the murder or maiming of U.S. military forces in either Iraq or Afghanistan. On or about May 21, 2004, the defendants traveled to Cairo, Egypt, with the intent of engaging in acts that would result in the murder or maiming of U.S. military forces in Iraq or Afghanistan. Furthermore, Zubair and Khaleel Ahmed researched the purchase of firearms, methods of obtaining firearms instruction (including at least one visit to a firing range) and methods of obtaining instruction in gunsmithing. In addition, the defendants collected videos of attacks on U.S. military forces overseas, manuals on military tactics and military manuals on weaponry.

---

[8] Virginia Man Sentenced to More Than 11 Years for Providing Material Support to ISIL, THE UNITED STATES DEPARTMENT OF JUSTICE (2015), https://www.justice.gov/opa/pr/virginia-man-sentenced-more-11-years-providing-material-support-isil.

[9] Zubair and Khaleel Ahmed Sentenced for Providing Material Support to Terrorists, THE FEDERAL BUREAU OF INVESTIGATION (2010), https://archives.fbi.gov/archives/cleveland/press-releases/2010/cl071210.htm.

- **Mufid Elfgeeh**, a national of Yemen, was admitted to the United States in 1997 as a family member of a naturalized United States citizen from Yemen. Elfgeeh subsequently became a United States citizen through naturalization. The petitioning family member originally entered the United States in 1966 under the immigration classification P-51 (no longer used), as the sibling of a United States citizen over the age of 21. In 2016, Elfgeeh was sentenced to more than 22 years in prison for attempting to recruit fighters for ISIS.[10]

  According to court documents, from December 2013 through May 31, 2014, Elfgeeh actively recruited and attempted to send two individuals – both of whom were cooperating with the FBI at the time – to Syria to join and fight on behalf of ISIS. Additionally, Elfgeeh also sent $600 to a third individual in Aden, Yemen, in an effort to assist that individual in traveling from Yemen to Syria for the purpose of joining and fighting on behalf of ISIS.

  In March 2014, Elfgeeh communicated with a Syrian national alleged to be the military commander of the Green Battalion of the United Rebels of Homs-Al-Murabitun, a group of fighters located in Homs, Syria. At the time, the battalion was blockaded in Homs and needed military support, including ammunition, mortar shells and explosives that could penetrate armored vehicles, to break out. Elfgeeh facilitated communication and coordination between the battalion commander and ISIS leadership for the purpose of the commander and his battalion pledging their allegiance to and joining ISIS.

  During the course of his criminal conduct, Elfgeeh used social media to receive and disseminate information about foreign terrorist groups and their activities in Syria and other countries; to declare his support for violent jihad, ISIS and other foreign terrorist groups; to inspire and encourage others to engage in violent jihad and/or pledge allegiance to ISIS and other foreign terrorist groups; and to seek financial contributions to assist jihadist fighters.

- **Uzair Paracha**, a national of Pakistan, was admitted to the United States in 1980 as a family member of a lawful permanent resident from Pakistan. In 2006, he was sentenced to 30 years in federal prison for providing material support to al Qaeda.[11]

  The evidence at trial proved that Paracha agreed with his father, Saifullah Paracha, and two al Qaeda members, Majid Khan and Ammar Al-Baluchi, to provide support to al Qaeda by, among other things, trying to help Khan obtain a travel document that would have allowed Khan to re-enter the United States to commit a terrorist act. Statements from Khan admitted at trial revealed that, once inside the United States, Khan intended to carry out an attack on gasoline stations. In February and March 2003, Paracha posed as Khan during telephone calls with the former

---

[10] New York Man Sentenced to Over 22 Years in Prison for Attempting to Recruit Fighters for ISIL, THE UNITED STATES DEPARTMENT OF JUSTICE (2016), https://www.justice.gov/opa/pr/new-york-man-sentenced-over-22-years-prison-attempting-recruit-fighters-isil.

[11] Pakistani Man Convicted of Providing Material Support to al Qaeda Sentenced to 30 Years in Federal Prison, THE UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK (2006), https://www.justice.gov/archive/usao/nys/pressreleases/July06/parachasentencingpr.pdf.

Immigration and Naturalization Service (now Immigration and Customs Enforcement), called Khan's bank, and attempted to gather information about Khan's immigration paperwork via the Internet. Paracha also agreed to use Khan's credit card to make it appear that Khan was in the United States, when in fact Khan was in Pakistan. Paracha and his father had discussed with Khan and Al-Baluchi the possibility of the Parachas receiving up to $200,000 from al Qaeda in connection with the assistance Paracha was providing to Khan, which the Paracha hoped to invest in their businesses.

While DOJ is responsible for prosecuting international terrorism-related offenses in the federal courts, not all cases involving foreign nationals with a nexus to terrorism are suitable for criminal prosecution. In certain instances, the removal of an individual from the United States may be the most effective way to fulfill the national security interests of the United States.[12]

According to information available to the United States Immigration and Customs Enforcement (ICE), since September 11, 2001, there were approximately 1,716 removals of aliens with national security concerns. This number includes, but is not limited to, aliens suspected of being involved in terrorist or other security-related activities including aliens described in sections 212(a)(3) or 237(a)(4) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(3), 1227(a)(4), and aliens for whom ICE was made aware of sensitive national security information.

    b.   Information Regarding the Number of Foreign Nationals in the United States Who Have Been Radicalized After Entry into the United States and Who Have Engaged in Terrorism-Related Acts, or Who Have Provided Material Support to Terrorism-Related Organizations in Countries That Pose a Threat to the United States.

As of the date of this report's issuance, DHS and DOJ lack unclassified, aggregated statistical information pertaining to the timing of individual radicalization. DHS and DOJ will endeavor to provide greater clarity on the percentage of individuals who appear to have radicalized to violence after their entry into the United States. Additionally, for purposes of advancing terrorism prevention activities, DHS and DOJ will continue to explore the timing and trends related to the radicalization of such individuals.

    c.   Information Regarding the Number and Types of Acts of Gender-Based Violence Against Women, Including So-Called "Honor Killings," in the United States by Foreign Nationals.

According to the Bureau of Justice Statistics, between 2006 and 2015, there were approximately 1.3 million non-fatal domestic violence victimizations each year.[13] It is unclear how many were perpetrated by foreign nationals because the federal government has not recorded and tracked in an aggregated statistical manner information pertaining to gender-based violence against women committed at the federal and state level. Such offenses are overwhelmingly prosecuted at the state level, and most states currently do not track crimes in their

---

[12] Some individuals convicted on terrorism-related charges in the United States have since served their sentences and been released, and a portion of those were aliens who were subsequently removed. In future Section 11 reports, DHS and DOJ will work to provide a breakdown of these figures.

[13] U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Special Report: Police Response to Domestic Violence 2006-2015* (2017), *available at* https://www.bjs.gov/content/pub/pdf/prdv0615.pdf.

jurisdictions based on the immigration status of the offender. DHS and DOJ will work to obtain and aggregate information responsive to this requirement of Section 11.

There is no federal statute specifically prohibiting "honor killings" and the federal government lacks comprehensive data regarding incidents of such offenses at the state and local levels. Although the federal government lacks independent data regarding incidents of honor killings, a study commissioned and provided to the DOJ's Bureau of Justice Statistics in 2014 estimated that an average of 23-27 honor killings occur every year in the United States. Based on a representative sample studied through open media sources, 91 percent of the victims in honor killings in North America were murdered for being "too westernized."[14] The study further estimated that approximately 1,500 forced marriages occur every year in the United States.

Additional information is also publicly available regarding incidents of gender-based violence against women—which can occur in contexts other than so-called "honor killings," such as sex offenses, and Female Genital Mutilation (FGM).

Regarding sex offenses, the Government Accountability Office (GAO) in 2011 produced an estimate regarding the population of criminal aliens incarcerated in state prisons and local jails from fiscal years 2003 through 2009.[15] In that report, GAO estimated that over that period, aliens were convicted for 69,929 sex offenses—which, although not explicitly stated in the report, in most instances constitutes gender-based violence against women.[16]

FGM represents another form of gender-based violence against women, and is a federal criminal offense under 18 U.S.C. § 116. It, too, constitutes another crime that has not been tracked in a statistically-aggregated manner at the state level, and is largely underreported. However, a study completed in 2016 by the Centers for Disease Control estimated that 513,000 women and girls in the United States were at risk for undergoing FGM or its consequences in 2012—a number three times higher than the number estimated at risk in 1990.[17] It further noted that, although further research is necessary to gather scientifically valid data with respect to the practice in the United States, the estimated increase "was wholly a result of rapid growth in the number of immigrants from FGM/C-practicing countries living in the United States."

    d.   <u>Any Other Information Relevant to Public Safety and Security as Determined by the Secretary of Homeland Security or the Attorney General, Including Information on the Immigration Status of Foreign Nationals Charged with Major Offenses.</u>

    i.   *DHS Encounters with Known or Suspected Terrorists*

The United States faces a serious and persistent terror threat, and individuals with ties to terror can and will use any pathway to enter our country. Accordingly, DHS has taken significant

---

[14] Cynthia Helba et al., *Report on Exploratory Study into Honor Violence Measurement Methods* (2014), *available at* https://www.ncjrs.gov/pdffiles1/bjs/grants/248879.pdf.

[15] U.S. Gen. Accountability Office, GAO-11-187, *Criminal Alien Statistics—Information on Incarcerations, Arrests, and Costs* (2011), *available at* http://www.gao.gov/assets/320/316959.pdf.

[16] *Id.* at 21.

[17] Howard Goldberg et al., *Female Genital Mutilation/Cutting in the United States: Updated Estimates of Women and Girls at Risk, 2012*, 131 Public Health Reports 340–347 (2016), *available at* http://journals.sagepub.com/doi/pdf/10.1177/003335491613100218.

steps to improve the security of all potential routes used by known or suspected terrorists (KST) to travel to the United States to ensure that individuals who would do harm to Americans are identified and detected, and their plots are disrupted. These figures reflect the challenges faced by the United States and demonstrate the necessity to remain vigilant and proactive in our counterterrorism posture.

DHS is focused on keeping nefarious actors out of the United States, especially KSTs. During the course of any given year, the Department encounters thousands of terror-connected individuals attempting to reach our territory, whether by air, sea, or land. In the interest of transparency, DHS is producing recent figures detailing DHS encounters with KSTs.

In fiscal year 2017, DHS had 2,554 encounters with individuals on the terrorist watchlist (also known as the FBI's Terrorist Screening Database) traveling to the United States. Of those encounters, 335 were attempting to enter by land, 2,170 were attempting to enter by air, and 49 were attempting to enter by sea. Where consistent with the law, such individuals are denied entry into the United States, while in some cases law enforcement authorities are notified and can take appropriate action. This data only includes individuals of which the United States encountered and not all of those who may have entered or attempted to enter the country undetected.

    ii.   *Arrests and Removals of Aliens Convicted of Aggravated Felonies or Two or More Felonies*

DHS Components maintain a variety of statistics on foreign nationals charged with aggravated felonies[18] to include drug trafficking offenses, national security crimes, and violent crimes such as murder, rape, robbery, and kidnapping.

ICE statistics reflect that from October 1, 2011, to September 30, 2017, a total of 355,345 non-U.S. citizen offenders[19] were arrested by ICE for purposes of removal[20] after previously having been convicted of an *aggravated felony*, as defined in 8 U.S.C. § 1101(a)(43), or two or more crimes each punishable by more than one year (felony offenses). During that same period, a total of 372,098[21] non-U.S. citizen offenders were removed from the United States after conviction of an aggravated felony or two or more felonies.

    iii.   *Egregious Public Safety Referrals*

The United States Citizenship and Immigration Services (USCIS) and ICE work together as part of their unity of effort to expedite the removal of criminal aliens. Upon receiving a request by a foreign national for immigration-related benefits, USCIS' Fraud Detection and National Security Directorate (FDNS) refers information to ICE that indicates a foreign national is under

---

[18] *See* 8 U.S.C. § 1101(a)(43).

[19] This number reflects only those aliens who ICE was able to identify and locate or encountered through enforcement operations. As a result of non-cooperation with ICE enforcement operations by some jurisdictions, a significant number of criminal aliens within this category were not identified and located or encountered by ICE and, as a consequence, were not included in this total.

[20] This represents a combination of immigration-related and criminal violations.

[21] This number reflects only those aliens who ICE was able to identify and locate or encountered through enforcement operations. As a result of non-cooperation with ICE enforcement operations by some jurisdictions, a significant number of criminal aliens within this category were not identified and located or encountered by ICE and, as a consequence, were not included in this total.

investigation, has been arrested for (without disposition), or has been convicted of an egregious felony including, but not limited to:  murder; rape, firearms trafficking, child pornography, and other significant felonies.

Data from USCIS' FDNS Directorate shows that between 2007 and 2017, USCIS referred 45,858 foreign nationals who applied for immigration benefits to ICE for criminal or civil enforcement action, based on information indicating that such foreign nationals had committed egregious public safety-related offenses within the United States.

iv. *Foreign Nationals Denied Boarding on Flights Destined for the United States*

Finally, as published in the United States Customs and Border Protection's (CBP) annual "Border Security Report," the National Targeting Center (NTC), the Immigration Advisory Program (IAP), and the Regional Carrier Liaison Group (RCLG) led CBP efforts between FY 2010 and FY 2016 to identify and prevent the boarding of 73,261 foreign travelers on flights destined for the United States, who may have presented an immigration or security risk.

CBP works with industry partners to ensure the safety of the traveling public.  IAP employs CBP officers at foreign airports where they review passenger information and/or assess the passenger documentation prior to their U.S.-bound flights.  IAP officers make "no board" recommendations to carriers and host governments regarding passengers bound for the United States.  RCLGs located in Honolulu, Miami, and New York, expand the Nation's zone of security beyond the physical U.S. borders by working with commercial carriers to prevent the boarding of passengers who may pose a security threat, have fraudulent travel documents, or are otherwise inadmissible to the United States.

**III.    Conclusion**

DHS and DOJ play a vital role in protecting the national security of the United States, especially against terror threats.  DHS actively works to block known or suspected terrorists from entering the United States and is also focused on combating terrorist radicalization and recruitment in U.S. communities.  DOJ is committed to the continued investigation and criminal prosecution of terrorists and other malicious actors, as well as criminal and civil denaturalization of U.S. citizens who derive their citizenship through naturalization fraud.

DHS, in consultation with DOJ, will continue to report appropriate information regarding terrorism-related activity, as well as other information as directed under the President's Executive Order, in an effort to highlight the threats facing the United States, trends, and relevant U.S. Government actions.  At the same time, DHS and DOJ urge all U.S. states to work closely with the federal government on closing the data collection gaps identified in this report in the interest of full transparency and accountability to the American people.