


# Executive Order 13780: *Protecting the Nation From Foreign Terrorist Entry Into the United States* Initial Section 11 Report

January 2018

## I. Introduction

On March 6, 2017, President Donald J. Trump issued Executive Order 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States*, which declared that "it is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals," and directed a series of actions to enhance the security of the American people. The actions directed by Executive Order 13780 have—among other things—raised the baseline for the vetting and screening of foreign nationals, improved our ability to prevent the entry of malicious actors, and enhanced the security of the American people.

Most of the critical national security enhancements implemented and effectuated as a result of Executive Order 13780 are classified in nature, and will remain so to prevent malicious actors from exploiting our immigration system. However, to "be more transparent with the American people and to implement more effectively policies and practices that serve the national interest," Section 11 of Executive Order 13780 requires the Secretary of Homeland Security, in consultation with the Attorney General, to collect and make publicly available the following information:

(i) Information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;

(ii) Information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;

(iii) Information regarding the number and types of acts of gender-based violence against women, including so-called "honor killings," in the United States by foreign nationals; and,

(iv) Any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

Accordingly, subsequent to the issuance of Executive Order 13780, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) worked collaboratively to provide information responsive to the requirements of Section 11. Unless specified otherwise, this initial report includes information for the period from September 11, 2001 until the date of issuance. Notably, however, because of previous information collection and reporting practices of DHS and DOJ, some of the information provided in this initial report does not capture the full spectrum of statistics envisioned by Executive Order 13780. DHS and DOJ will endeavor to provide additional information in future reports issued pursuant to the requirements of Executive Order 13780.

## II.   Information Responsive to Section 11

   a. <u>Information Regarding the Number of Foreign Nationals Charged with or Convicted of Terrorism-Related Offenses, or Removed from the United States Based on Terrorism-Related or Other National Security Reasons.</u>

According to a list maintained by DOJ's National Security Division, at least 549 individuals were convicted of international terrorism-related charges in U.S. federal courts between September 11, 2001, and December 31, 2016.  An analysis conducted by DHS determined that approximately 73 percent (402 of these 549 individuals) were foreign-born.  Breaking down the 549 individuals by citizenship status at the time of their respective convictions reveals that:

- 254 were not U.S. citizens;
- 148 were foreign-born, naturalized and received U.S. citizenship; and,
- 147 were U.S. citizens by birth.[1]

Information pertaining to individuals convicted of international terrorism-related offenses after December 31, 2016, as well as information pertaining to individuals not yet convicted but facing charges for international terrorism-related offenses will be provided in future reports required by Section 11.

The conviction information outlined above is based on public convictions in federal courts between September 11, 2001, and December 31, 2016 resulting from international terrorism investigations, including investigations of terrorist acts planned or committed outside the territorial jurisdiction of the United States over which Federal criminal jurisdiction exists and those within the United States involving international terrorists and terrorist groups.  This information reflects defendants convicted in cases involving charged violations of federal statutes that are directly related to international terrorism,[2] as well as defendants convicted in cases involving charged violations of a variety of other statutes where the investigation involved an identified link to international terrorism.[3]  This information includes both individuals who committed offenses while located in the United States and those who committed offenses while located abroad, including defendants who were transported to the United States for prosecution. It does not include individuals convicted of offenses relating to domestic terrorism, nor does it include information related to terrorism-related convictions in state courts.

In future reports, DHS and DOJ will endeavor to provide additional details pertaining to foreign nationals or naturalized U.S. citizens convicted of international terrorism-related offenses, such as their manner of entry into the United States, countries of origin, general immigration histories, and other related information.  While DHS and DOJ do not yet have complete, final

---

[1] Information pertaining to the citizenship status of the parents of these 147 individuals was not available at the time of this report's issuance.
[2] These statutes prohibit, for example, terrorist acts abroad against United States nationals, the use of weapons of mass destruction, conspiracy to murder persons overseas, providing material support to terrorists or foreign terrorist organizations, receiving military style training from foreign terrorist organizations, and bombings of public places or government facilities.
[3] For example, these cases could include offenses such as those involving fraud, immigration, firearms, drugs, false statements, perjury, and obstruction of justice, as well as general conspiracy charges.

information about these individuals available at the time of this report's publication, the following are illustrative examples among the 402 convictions of foreign nationals or naturalized U.S. citizens:

- **Mahmoud Amin Mohamed Elhassan**, a national of Sudan, was admitted to the United States in 2012 as a family member of a lawful permanent resident from Sudan. In 2016, he pleaded guilty to attempting to provide material support to ISIS, and in 2017 was subsequently sentenced to 11 years in prison.[4]

  According to court documents, Elhassan aided and abetted the attempt of Joseph Hassan Farrokh, 29, to travel from the United States to Syria in order to fight on behalf of ISIS. As part of their plan, Farrokh would travel first, followed by Elhassan at a later date. Farrokh and Elhassan spoke in detail about their potential travel. Both men spoke openly with each other about supporting ISIS and violent jihad, with Farrokh saying on October 2, 2015, that he had no patience and wanted to go right away and "chop their heads."

  According to the statement of facts, in an effort to conceal their plans to support ISIS, Farrokh and Elhassan communicated using apps they believed were safe from law enforcement detection. In the summer of 2015, Farrokh and Elhassan talked more seriously about going to join ISIS and concluded that they needed someone to help them do so. Elhassan contacted like-minded people all over the world and the men pursued two separate plans to travel to Syria to join ISIS.

  According to the statement of facts, Farrokh and Elhassan conspired with other persons they believed would help facilitate their travel to Syria. Over the course of many meetings, the men discussed in detail their travel plans and efforts to avoid law enforcement detection, including Farrokh shaving his beard and flying out of Richmond International Airport, where they believed there would be less security. Farrokh and Elhassan agreed that Farrokh should tell his family that he intended to travel to Saudi Arabia to study.

- **Abdurasaul Hasanovich Juraboev**, a national of Uzbekistan, was admitted to the United States as a diversity visa lottery recipient in 2011. In 2015, he pleaded guilty to conspiring to support ISIS, and in 2017 was subsequently sentenced to 15 years in prison.[5]

  According to court documents, Juraboev posted a threat on an Uzbek-language website to kill President Obama in an act of martyrdom on behalf of ISIS. In subsequent interviews by federal agents, Juraboev stated his belief in ISIS's terrorist agenda, including the establishment by force of an Islamic caliphate in Iraq and Syria. Juraboev stated that he wanted to travel to Syria to fight on behalf of

---

[4] Virginia Man Sentenced to 11 Years in Prison for Attempting to Provide Material Support to ISIL, THE UNITED STATES DEPARTMENT OF JUSTICE (2017), https://www.justice.gov/opa/pr/virginia-man-sentenced-11-years-prison-attempting-provide-material-support-isil.

[5] Brooklyn Man Sentenced to 15 Years in Prison for Conspiring to Provide Material Support to Terrorists, THE UNITED STATES DEPARTMENT OF JUSTICE (2016), https://www.justice.gov/usao-edny/pr/brooklyn-man-sentenced-15-years-prison-conspiring-provide-material-support-terrorists.

3

ISIS but lacked the means to travel. He added that, if he were unable to travel, he would engage in an act of martyrdom on U.S. soil if ordered to do so by ISIS, such as killing the President or planting a bomb on Coney Island. During the next several months, Juraboev and a co-conspirator discussed plans to travel to Syria to fight on behalf of ISIS, culminating in Juraboev's purchase on December 27, 2014, of a ticket to travel from John F. Kennedy International Airport in Queens, New York, to Istanbul, Turkey, departing on March 29, 2015.

- **Abdinassir Mohamud Ibrahim**, a national of Somalia, was admitted to the United States as a refugee in 2007. In 2015, he was sentenced to 15 years in prison for conspiring to provide material support to Al-Shabaab, a designated foreign terrorist organization, and for making a false statement in an immigration matter.[6]

  Ibrahim admitted that from about May 18, 2010, to about January 31, 2014, he knowingly conspired to provide material support and resources, specifically sending emails enlisting support for al-Shabaab and making a cash payment to a known member of al-Shabaab for the benefit of the organization. Ibrahim knew at the time that al-Shabaab was designated by the United States as a foreign terrorist organization. Ibrahim also pleaded guilty to making a false statement in an immigration matter.

  According to court documents, Ibrahim lied in his application for naturalization as he had previously lied on his request for refugee status, falsely claiming that he was of a member of a minority group in Somalia and suffered persecution as a result thereof. Ibrahim also admitted he had lied on his naturalization application by having previously lied on his refugee application by falsely claiming that he had not provided material support to a terrorist group, when he had in fact provided monetary support to a member of a terrorist organization.

- **Mohamad Saeed Kodaimati**, a national of Syria, was admitted to the United States in 2001 as a family member of a lawful permanent resident from Syria, and subsequently obtained United States citizenship through naturalization. Kodaimati entered the United States with the family member. That family member was previously admitted as the unmarried son or daughter of a lawful permanent resident, who earlier received status as the parent of a United States citizen. In 2016, Kodaimati was sentenced to 96 months in prison for making false statements in a terrorism investigation.[7]

  As part of his guilty plea, Kodaimati acknowledged that he lied in March 2015 when he stated that he did not know any members of Islamic State in Iraq, a designated foreign terrorist organization known as ISIS; that he falsely claimed that while in Syria he was never involved with Al Nusrah, also a foreign terrorist

---

[6] Somali Citizen Sentenced to 15 Years in Federal Prison for Conspiring to Provide Material Support to Al-Shabaab, THE UNITED STATES DEPARTMENT OF JUSTICE (2015), https://www.justice.gov/usao-wdtx/pr/somali-citizen-sentenced-15-years-federal-prison-conspiring-provide-material-support-al.

[7] San Diego Man Sentenced to 96 months in Prison for Making False Statements in an International Terrorism Investigation, THE UNITED STATES DEPARTMENT OF JUSTICE (2016), https://www.justice.gov/usao-sdca/pr/san-diego-man-sentenced-96-months-prison-making-false-statements-international.

organization; and that he again lied when he said that while in Syria he had never engaged in combat or fired a weapon at anyone.

In his plea agreement, Kodaimati admitted that he knew a member of ISIS and that while in Syria he participated in a battle against the Syrian regime, including shooting at others, in coordination with Al Nusrah fighters.

- **Ali Shukri Amin**, a national of Sudan, was admitted to the United States in 1999 as the child of a diversity visa lottery recipient, and subsequently obtained United States citizenship through naturalization. In 2015, he was sentenced to more than 11 years in prison for conspiring to provide material support and resources to ISIS.[8]

  According to court documents, Amin admitted to using Twitter to provide advice and encouragement to ISIS and its supporters. Amin provided instruction on how to use Bitcoin, a virtual currency, to mask the provision of funds to ISIS, as well as facilitating ISIS supporters seeking to travel to Syria to fight with ISIS. Additionally, Amin admitted that he assisted an 18-year-old male resident of Virginia, Reza Niknejad, to travel to Syria to join ISIS in January 2015. Niknejad was subsequently charged with conspiring to provide material support to terrorists, conspiring to provide material support to ISIS, and conspiring to kill and injure persons abroad.

- **Khaleel Ahmed,** a national of India, was admitted to the United States in 1998 as a family member of a naturalized United States citizen from India. Ahmed subsequently became a United States citizen through naturalization. In 2010, he was sentenced to more than eight years in prison for conspiring to provide material support to terrorists.[9]

  According to court documents, the criminal conspiracy involving Khaleel Ahmed and his cousin, Zubair, began no later than April 1, 2004, and continued until their arrests on February 21, 2007. As part of the conspiracy, the defendants made preparations to travel overseas in order to engage in acts that would result in the murder or maiming of U.S. military forces in either Iraq or Afghanistan. On or about May 21, 2004, the defendants traveled to Cairo, Egypt, with the intent of engaging in acts that would result in the murder or maiming of U.S. military forces in Iraq or Afghanistan. Furthermore, Zubair and Khaleel Ahmed researched the purchase of firearms, methods of obtaining firearms instruction (including at least one visit to a firing range) and methods of obtaining instruction in gunsmithing. In addition, the defendants collected videos of attacks on U.S. military forces overseas, manuals on military tactics and military manuals on weaponry.

---

[8] Virginia Man Sentenced to More Than 11 Years for Providing Material Support to ISIL, THE UNITED STATES DEPARTMENT OF JUSTICE (2015), https://www.justice.gov/opa/pr/virginia-man-sentenced-more-11-years-providing-material-support-isil.
[9] Zubair and Khaleel Ahmed Sentenced for Providing Material Support to Terrorists, THE FEDERAL BUREAU OF INVESTIGATION (2010), https://archives.fbi.gov/archives/cleveland/press-releases/2010/cl071210.htm.

- **Mufid Elfgeeh**, a national of Yemen, was admitted to the United States in 1997 as a family member of a naturalized United States citizen from Yemen. Elfgeeh subsequently became a United States citizen through naturalization. The petitioning family member originally entered the United States in 1966 under the immigration classification P-51 (no longer used), as the sibling of a United States citizen over the age of 21. In 2016, Elfgeeh was sentenced to more than 22 years in prison for attempting to recruit fighters for ISIS.[10]

  According to court documents, from December 2013 through May 31, 2014, Elfgeeh actively recruited and attempted to send two individuals – both of whom were cooperating with the FBI at the time – to Syria to join and fight on behalf of ISIS. Additionally, Elfgeeh also sent $600 to a third individual in Aden, Yemen, in an effort to assist that individual in traveling from Yemen to Syria for the purpose of joining and fighting on behalf of ISIS.

  In March 2014, Elfgeeh communicated with a Syrian national alleged to be the military commander of the Green Battalion of the United Rebels of Homs-Al-Murabitun, a group of fighters located in Homs, Syria. At the time, the battalion was blockaded in Homs and needed military support, including ammunition, mortar shells and explosives that could penetrate armored vehicles, to break out. Elfgeeh facilitated communication and coordination between the battalion commander and ISIS leadership for the purpose of the commander and his battalion pledging their allegiance to and joining ISIS.

  During the course of his criminal conduct, Elfgeeh used social media to receive and disseminate information about foreign terrorist groups and their activities in Syria and other countries; to declare his support for violent jihad, ISIS and other foreign terrorist groups; to inspire and encourage others to engage in violent jihad and/or pledge allegiance to ISIS and other foreign terrorist groups; and to seek financial contributions to assist jihadist fighters.

- **Uzair Paracha**, a national of Pakistan, was admitted to the United States in 1980 as a family member of a lawful permanent resident from Pakistan. In 2006, he was sentenced to 30 years in federal prison for providing material support to al Qaeda.[11]

  The evidence at trial proved that Paracha agreed with his father, Saifullah Paracha, and two al Qaeda members, Majid Khan and Ammar Al-Baluchi, to provide support to al Qaeda by, among other things, trying to help Khan obtain a travel document that would have allowed Khan to re-enter the United States to commit a terrorist act. Statements from Khan admitted at trial revealed that, once inside the United States, Khan intended to carry out an attack on gasoline stations. In February and March 2003, Paracha posed as Khan during telephone calls with the former

---

[10] New York Man Sentenced to Over 22 Years in Prison for Attempting to Recruit Fighters for ISIL, THE UNITED STATES DEPARTMENT OF JUSTICE (2016), https://www.justice.gov/opa/pr/new-york-man-sentenced-over-22-years-prison-attempting-recruit-fighters-isil.

[11] Pakistani Man Convicted of Providing Material Support to al Qaeda Sentenced to 30 Years in Federal Prison, THE UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK (2006), https://www.justice.gov/archive/usao/nys/pressreleases/July06/parachasentencingpr.pdf.

Immigration and Naturalization Service (now Immigration and Customs Enforcement), called Khan's bank, and attempted to gather information about Khan's immigration paperwork via the Internet. Paracha also agreed to use Khan's credit card to make it appear that Khan was in the United States, when in fact Khan was in Pakistan. Paracha and his father had discussed with Khan and Al-Baluchi the possibility of the Parachas receiving up to $200,000 from al Qaeda in connection with the assistance Paracha was providing to Khan, which the Paracha hoped to invest in their businesses.

While DOJ is responsible for prosecuting international terrorism-related offenses in the federal courts, not all cases involving foreign nationals with a nexus to terrorism are suitable for criminal prosecution. In certain instances, the removal of an individual from the United States may be the most effective way to fulfill the national security interests of the United States.[12]

According to information available to the United States Immigration and Customs Enforcement (ICE), since September 11, 2001, there were approximately 1,716 removals of aliens with national security concerns. This number includes, but is not limited to, aliens suspected of being involved in terrorist or other security-related activities including aliens described in sections 212(a)(3) or 237(a)(4) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(3), 1227(a)(4), and aliens for whom ICE was made aware of sensitive national security information.

   b. <u>Information Regarding the Number of Foreign Nationals in the United States Who Have Been Radicalized After Entry into the United States and Who Have Engaged in Terrorism-Related Acts, or Who Have Provided Material Support to Terrorism-Related Organizations in Countries That Pose a Threat to the United States.</u>

As of the date of this report's issuance, DHS and DOJ lack unclassified, aggregated statistical information pertaining to the timing of individual radicalization. DHS and DOJ will endeavor to provide greater clarity on the percentage of individuals who appear to have radicalized to violence after their entry into the United States. Additionally, for purposes of advancing terrorism prevention activities, DHS and DOJ will continue to explore the timing and trends related to the radicalization of such individuals.

   c. <u>Information Regarding the Number and Types of Acts of Gender-Based Violence Against Women, Including So-Called "Honor Killings," in the United States by Foreign Nationals.</u>

According to the Bureau of Justice Statistics, between 2006 and 2015, there were approximately 1.3 million non-fatal domestic violence victimizations each year.[13] It is unclear how many were perpetrated by foreign nationals because the federal government has not recorded and tracked in an aggregated statistical manner information pertaining to gender-based violence against women committed at the federal and state level. Such offenses are overwhelmingly prosecuted at the state level, and most states currently do not track crimes in their

---

[12] Some individuals convicted on terrorism-related charges in the United States have since served their sentences and been released, and a portion of those were aliens who were subsequently removed. In future Section 11 reports, DHS and DOJ will work to provide a breakdown of these figures.

[13] U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Special Report: Police Response to Domestic Violence 2006-2015* (2017), *available at* https://www.bjs.gov/content/pub/pdf/prdv0615.pdf.

jurisdictions based on the immigration status of the offender. DHS and DOJ will work to obtain and aggregate information responsive to this requirement of Section 11.

There is no federal statute specifically prohibiting "honor killings" and the federal government lacks comprehensive data regarding incidents of such offenses at the state and local levels. Although the federal government lacks independent data regarding incidents of honor killings, a study commissioned and provided to the DOJ's Bureau of Justice Statistics in 2014 estimated that an average of 23-27 honor killings occur every year in the United States. Based on a representative sample studied through open media sources, 91 percent of the victims in honor killings in North America were murdered for being "too westernized."[14] The study further estimated that approximately 1,500 forced marriages occur every year in the United States.

Additional information is also publicly available regarding incidents of gender-based violence against women—which can occur in contexts other than so-called "honor killings," such as sex offenses, and Female Genital Mutilation (FGM).

Regarding sex offenses, the Government Accountability Office (GAO) in 2011 produced an estimate regarding the population of criminal aliens incarcerated in state prisons and local jails from fiscal years 2003 through 2009.[15] In that report, GAO estimated that over that period, aliens were convicted for 69,929 sex offenses—which, although not explicitly stated in the report, in most instances constitutes gender-based violence against women.[16]

FGM represents another form of gender-based violence against women, and is a federal criminal offense under 18 U.S.C. § 116. It, too, constitutes another crime that has not been tracked in a statistically-aggregated manner at the state level, and is largely underreported. However, a study completed in 2016 by the Centers for Disease Control estimated that 513,000 women and girls in the United States were at risk for undergoing FGM or its consequences in 2012—a number three times higher than the number estimated at risk in 1990.[17] It further noted that, although further research is necessary to gather scientifically valid data with respect to the practice in the United States, the estimated increase "was wholly a result of rapid growth in the number of immigrants from FGM/C-practicing countries living in the United States."

> d. <u>Any Other Information Relevant to Public Safety and Security as Determined by the Secretary of Homeland Security or the Attorney General, Including Information on the Immigration Status of Foreign Nationals Charged with Major Offenses.</u>
>
> i. *DHS Encounters with Known or Suspected Terrorists*

The United States faces a serious and persistent terror threat, and individuals with ties to terror can and will use any pathway to enter our country. Accordingly, DHS has taken significant

---

[14] Cynthia Helba et al., *Report on Exploratory Study into Honor Violence Measurement Methods* (2014), *available at* https://www.ncjrs.gov/pdffiles1/bjs/grants/248879.pdf.

[15] U.S. Gen. Accountability Office, GAO-11-187, *Criminal Alien Statistics—Information on Incarcerations, Arrests, and Costs* (2011), *available at* http://www.gao.gov/assets/320/316959.pdf.

[16] *Id.* at 21.

[17] Howard Goldberg et al., *Female Genital Mutilation/Cutting in the United States: Updated Estimates of Women and Girls at Risk, 2012*, 131 Public Health Reports 340–347 (2016), *available at* http://journals.sagepub.com/doi/pdf/10.1177/003335491613100218.

steps to improve the security of all potential routes used by known or suspected terrorists (KST) to travel to the United States to ensure that individuals who would do harm to Americans are identified and detected, and their plots are disrupted. These figures reflect the challenges faced by the United States and demonstrate the necessity to remain vigilant and proactive in our counterterrorism posture.

DHS is focused on keeping nefarious actors out of the United States, especially KSTs. During the course of any given year, the Department encounters thousands of terror-connected individuals attempting to reach our territory, whether by air, sea, or land. In the interest of transparency, DHS is producing recent figures detailing DHS encounters with KSTs.

In fiscal year 2017, DHS had 2,554 encounters with individuals on the terrorist watchlist (also known as the FBI's Terrorist Screening Database) traveling to the United States. Of those encounters, 335 were attempting to enter by land, 2,170 were attempting to enter by air, and 49 were attempting to enter by sea. Where consistent with the law, such individuals are denied entry into the United States, while in some cases law enforcement authorities are notified and can take appropriate action. This data only includes individuals of which the United States encountered and not all of those who may have entered or attempted to enter the country undetected.

ii. *Arrests and Removals of Aliens Convicted of Aggravated Felonies or Two or More Felonies*

DHS Components maintain a variety of statistics on foreign nationals charged with aggravated felonies[18] to include drug trafficking offenses, national security crimes, and violent crimes such as murder, rape, robbery, and kidnapping.

ICE statistics reflect that from October 1, 2011, to September 30, 2017, a total of 355,345 non-U.S. citizen offenders[19] were arrested by ICE for purposes of removal[20] after previously having been convicted of an *aggravated felony*, as defined in 8 U.S.C. § 1101(a)(43), or two or more crimes each punishable by more than one year (felony offenses). During that same period, a total of 372,098[21] non-U.S. citizen offenders were removed from the United States after conviction of an aggravated felony or two or more felonies.

iii. *Egregious Public Safety Referrals*

The United States Citizenship and Immigration Services (USCIS) and ICE work together as part of their unity of effort to expedite the removal of criminal aliens. Upon receiving a request by a foreign national for immigration-related benefits, USCIS' Fraud Detection and National Security Directorate (FDNS) refers information to ICE that indicates a foreign national is under

---

[18] *See* 8 U.S.C. § 1101(a)(43).

[19] This number reflects only those aliens who ICE was able to identify and locate or encountered through enforcement operations. As a result of non-cooperation with ICE enforcement operations by some jurisdictions, a significant number of criminal aliens within this category were not identified and located or encountered by ICE and, as a consequence, were not included in this total.

[20] This represents a combination of immigration-related and criminal violations.

[21] This number reflects only those aliens who ICE was able to identify and locate or encountered through enforcement operations. As a result of non-cooperation with ICE enforcement operations by some jurisdictions, a significant number of criminal aliens within this category were not identified and located or encountered by ICE and, as a consequence, were not included in this total.

investigation, has been arrested for (without disposition), or has been convicted of an egregious felony including, but not limited to: murder; rape, firearms trafficking, child pornography, and other significant felonies.

Data from USCIS' FDNS Directorate shows that between 2007 and 2017, USCIS referred 45,858 foreign nationals who applied for immigration benefits to ICE for criminal or civil enforcement action, based on information indicating that such foreign nationals had committed egregious public safety-related offenses within the United States.

iv. *Foreign Nationals Denied Boarding on Flights Destined for the United States*

Finally, as published in the United States Customs and Border Protection's (CBP) annual "Border Security Report," the National Targeting Center (NTC), the Immigration Advisory Program (IAP), and the Regional Carrier Liaison Group (RCLG) led CBP efforts between FY 2010 and FY 2016 to identify and prevent the boarding of 73,261 foreign travelers on flights destined for the United States, who may have presented an immigration or security risk.

CBP works with industry partners to ensure the safety of the traveling public. IAP employs CBP officers at foreign airports where they review passenger information and/or assess the passenger documentation prior to their U.S.-bound flights. IAP officers make "no board" recommendations to carriers and host governments regarding passengers bound for the United States. RCLGs located in Honolulu, Miami, and New York, expand the Nation's zone of security beyond the physical U.S. borders by working with commercial carriers to prevent the boarding of passengers who may pose a security threat, have fraudulent travel documents, or are otherwise inadmissible to the United States.

## III. Conclusion

DHS and DOJ play a vital role in protecting the national security of the United States, especially against terror threats. DHS actively works to block known or suspected terrorists from entering the United States and is also focused on combating terrorist radicalization and recruitment in U.S. communities. DOJ is committed to the continued investigation and criminal prosecution of terrorists and other malicious actors, as well as criminal and civil denaturalization of U.S. citizens who derive their citizenship through naturalization fraud.

DHS, in consultation with DOJ, will continue to report appropriate information regarding terrorism-related activity, as well as other information as directed under the President's Executive Order, in an effort to highlight the threats facing the United States, trends, and relevant U.S. Government actions. At the same time, DHS and DOJ urge all U.S. states to work closely with the federal government on closing the data collection gaps identified in this report in the interest of full transparency and accountability to the American people.